# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

| | |
|---|---|
| LISA SPRADLIN, individually, and as | ) |
| Administrator of the ESTATE of | ) |
| CHARLES "TRISTEN" MCKEE | ) |
| Plaintiff, | ) CIVIL ACTION |
| | ) FILE NO. |
| v. | ) |
| ANNETTIA TOBY, Warden, | ) |
| JEREMY FOSTON, Deputy Warden | ) |
| CALPURNIA WASHINGTON, Deputy Warden) | ) Jury Trial |
| GEORGE IVEY, Deputy Warden | ) Demanded |
| OFFICER STEPHANIE MACKLIN | ) |
| OFFICER LACOSTA ELLISON | ) |
| GEORGE IVEY, Deputy Warden | ) |
| OFFICER DA'MARQUEZ CRAYTON | ) |
| OFFICER EVONNE MARIE FOYE | ) |
| OFFICER KRYSTAL HARRIS | ) |
| OFFICER LOUIS JONES | ) |
| OFFICER DOLLY MARIE LEWIS | ) |
| OFFICER GEORGIA MAE REEVES | ) |
| OFFICER RAPUNZEL TUCKER | ) |
| OFFICER DEXTER WILEY | ) |
| OFFICER ADRIAN L. WILLIAMSON | ) |
| OFFICER DANZA DAQUEL WILSON | ) |
| OFFICER Y. HUNT | ) |
| LT. ULYSSES FLOYD | ) |
| SGT. TUKES | ) |
| OFFICER DONALD JEZEWSKI | ) |
| LT. FRANKLIN | ) |
| LT. WRIGHT | ) |
| OFFICER BATTLE | ) |
| OFFICER VERSHINA SCARBOROUGH | ) |
| SANDRA ROBERTS | ) |
| JOHN DOES #1 to #5 | ) |
| GEORGIA DEPARTMENT OF CORRECTIONS | ) |
| GEORGIA BOARD OF REGENTS | ) |
| Defendants_____ | ) |

## COMPLAINT FOR DAMAGES

1.

CHARLES "TRISTEN" MCKEE was killed in Hancock State Prison on May 22, 2022 because the prison and its employees failed to keep MCKEE safe, violating MCKEE's rights guaranteed by the Eighth and/or Fourteenth Amendments to the Constitution of the United States, Title 42, Section 1983 of the United States Code, the Americans with Disabilities Act and Rehabilitation Act, the laws of the United States, and/or the laws of the State of Georgia. Defendants also acted in concert with one another to violate Plaintiff's right of access to the courts under the First and Fourteenth Amendments by filing false reports and taking actions to cover up their misconduct after the fact.

### JURISDICTION AND VENUE

2.

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 as to Plaintiff's claims that arise under the Eighth and/or Fourteenth Amendments to the Constitution and/or laws of the United States, to wit 42 U.S.C. § 1983, and pursuant to § 1343, to redress the deprivation, under color of state law, of Charles "Tristen" MCKEE's rights guaranteed by the Constitution of the United States pursuant to §§ 1983 and 1988.  This action is also brought pursuant to the

Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 701, *et seq*.

3.

This Court also has supplemental jurisdiction over the state law claims, if any, which arise from the same facts and circumstances, pursuant to 28 U.S.C. § 1367.

4.

Venue is properly laid in this Court pursuant to 28 U.S.C. § 1391(b)(2) because this Court lies in the judicial district and division in which a substantial part of the events or omissions giving rise to the above-captioned action occurred.

5.

All parties are subject to the jurisdiction of this Court and Notice of Claim pursuant to O.C.G.A. § 50-21-26 has been provided.

**PARTIES**

6.

Plaintiff LISA SPRADLIN is a citizen of the State of West Virginia and the natural mother of Charles "Tristen" MCKEE, who was at Hancock State Prison when he died on May 22, 2022.

7.

Charles "Tristen" MCKEE is not survived by a spouse and had no children; MCKEE's mother LISA SPRADLIN is MCKEE's surviving heir and is applying to be administrator of MCKEE's Estate and now brings this action to vindicate MCKEE's rights. Plaintiff brings a wrongful death claim and a claim in her representative capacity on behalf of the Estate for pain and suffering and punitive damages.

8.

Defendant ANNETTIA TOBY was at all times relevant herein, an individual residing in the State of Georgia who was employed as a prison warden and supervisor by the Georgia Department of Corrections, acting under color of state law, and responsible for Charles "Tristen" McKee's health and safety. According to a press release Defendant Toby became Warden at Hancock State Prison effective July 1, 2016 and was/is responsible for overseeing 357 staff members and 1,191 close security male offenders.

9.

Defendant JEREMY FOSTON was at all times relevant herein, an individual residing in the State of Georgia who was employed as a prison warden and supervisor by the Georgia Department of Corrections, acting under color of state law, and responsible for Charles "Tristen" McKee's health and safety. According

to a press release dated April 29, 2019, Defendant Foston became deputy warden

of care and treatment at Hancock State prison effective May 1, 2019.  In this role

Defendant Foston oversee[s] the supervision of educational programs health

services, library services, counseling programs, recreational services and the

mental health services of approximately 1,191 close security male offenders.

10.

Defendant CALPURNIA WASHINGTON was at all times relevant herein,

an individual residing in the State of Georgia who was employed as a correctional

officer and or prison warden and or supervisor by the Georgia Department of

Corrections, acting under color of state law, and responsible for Charles "Tristen"

McKee's security, health and safety.  According to a press release dated April 16,

2022, Defendant Washington became deputy warden of security as of that date at

Hancock State Prison responsible for overseeing security staff member and over

900 medium-security male offenders.

11.

Defendant GEORGE IVEY was at all times relevant herein, an individual

residing in the State of Georgia who was employed as a correctional officer and or

prison warden and or supervisor by the Georgia Department of Corrections, acting

under color of state law, and responsible for Charles "Tristen" McKee's health and

safety.

12.

Defendant LACOSTA ELLISON was at all times relevant herein, an individual residing in the State of Georgia who was employed as a correctional officer by the Georgia Department of Corrections, acting under color of state law, and responsible for Charles "Tristen" McKee's health and safety.

13.

Defendant STEPHANIE MACKLIN was at all times relevant herein, an individual residing in the State of Georgia who was employed as a correctional officer by the Georgia Department of Corrections, acting under color of state law, and responsible for Charles "Tristen" McKee's health and safety.

14.

Defendant DA'MARQUEZ CRAYTON was at all times relevant herein, an individual residing in the State of Georgia who was employed as a correctional officer by the Georgia Department of Corrections, acting under color of state law, and responsible for Charles "Tristen" McKee's health and safety.

15.

Defendant EVONNE MARIE FOYE was at all times relevant herein, an individual residing in the State of Georgia who was employed as a correctional officer by the Georgia Department of Corrections, acting under color of state law, and responsible for Charles "Tristen" McKee's health and safety.

16.

Defendant KRYSTAL HARRIS was at all times relevant herein, an individual residing in the State of Georgia who was employed as a correctional officer by the Georgia Department of Corrections, acting under color of state law, and responsible for Charles "Tristen" McKee's health and safety.

17.

Defendant LOUIS JONES was at all times relevant herein, an individual residing in the State of Georgia who was employed as a correctional officer by the Georgia Department of Corrections, acting under color of state law, and responsible for Charles "Tristen" McKee's health and safety.

18.

Defendant DOLLY MARIE LEWIS was at all times relevant herein, an individual residing in the State of Georgia who was employed as a correctional officer by the Georgia Department of Corrections, acting under color of state law, and responsible for Charles "Tristen" McKee's health and safety.

19.

Defendant GEORGIA MAE REEVES was at all times relevant herein, an individual residing in the State of Georgia who was employed as a correctional officer by the Georgia Department of Corrections, acting under color of state law, and responsible for Charles "Tristen" McKee's health and safety.

20.

Defendant RAPUNZEL TUCKER was at all times relevant herein, an individual residing in the State of Georgia who was employed as a correctional officer by the Georgia Department of Corrections, acting under color of state law, and responsible for Charles "Tristen" McKee's health and safety.

21.

Defendant DEXTER WILEY was at all times relevant herein, an individual residing in the State of Georgia who was employed as a correctional officer by the Georgia Department of Corrections, acting under color of state law, and responsible for Charles "Tristen" McKee's health and safety.

22.

Defendant ADRIAN L. WILLIAMSON was at all times relevant herein, an individual residing in the State of Georgia who was employed as a correctional officer by the Georgia Department of Corrections, acting under color of state law, and responsible for Charles "Tristen" McKee's health and safety.

23.

Defendant DANZA DAQUEL WILSON was at all times relevant herein, an individual residing in the State of Georgia who was employed as a correctional officer by the Georgia Department of Corrections, acting under color of state law, and responsible for Charles "Tristen" McKee's health and safety.

24.

Defendant Y. HUNT was at all times relevant herein, an individual residing in the State of Georgia who was employed as a correctional officer by the Georgia Department of Corrections, acting under color of state law, and responsible for Charles "Tristen" McKee's health and safety.

25.

Defendant LT. ULYSSES FLOYD was at all times relevant herein, an individual residing in the State of Georgia who was employed as a correctional officer by the Georgia Department of Corrections, acting under color of state law, and responsible for Charles "Tristen" McKee's health and safety.

26.

Defendant SGT. TUKES was at all times relevant herein, an individual residing in the State of Georgia who was employed as a correctional officer by the Georgia Department of Corrections, acting under color of state law, and responsible for Charles "Tristen" McKee's health and safety.

27.

Defendant DONALD JEZEWSKI was at all times relevant herein, an individual residing in the State of Georgia who was employed as a correctional officer by the Georgia Department of Corrections, acting under color of state law, and responsible for Charles "Tristen" McKee's health and safety.

28.

Defendant LT. FRANKLIN was at all times relevant herein, an individual residing in the State of Georgia who was employed as a correctional officer by the Georgia Department of Corrections, acting under color of state law, and responsible for Charles "Tristen" McKee's health and safety.

29.

Defendant LT. WRIGHT was at all times relevant herein, an individual residing in the State of Georgia who was employed as a correctional officer by the Georgia Department of Corrections, acting under color of state law, and responsible for Charles "Tristen" McKee's health and safety.

30.

Defendant OFFICER BATTLE was at all times relevant herein, an individual residing in the State of Georgia who was employed as a correctional officer by the Georgia Department of Corrections, acting under color of state law, and responsible for Charles "Tristen" McKee's health and safety.

31.

Defendant OFFICER VERSHINA SCARBOROUGH was at all times relevant herein, an individual residing in the State of Georgia who was employed as a correctional officer by the Georgia Department of Corrections, acting under

color of state law, and responsible for Charles "Tristen" McKee's health and safety.

32.

Defendant SANDRA ROBERTS was at all times relevant herein, an individual residing in the State of Georgia who was responsible for Charles "Tristen" McKee's medical and mental health and safety.

33.

Defendants listed in allegations 13 through 31 Defendants listed were all named on government records as officers "directly involved" in the incident.  See, e.g. Johnson v. Jones, 515 U.S. 304 (1995) (evidence that officers were present, nearby when plaintiff was beaten was sufficient to deny qualified immunity on sufficiency of evidence grounds).  These Defendants failed to take reasonable steps to prevent the attack of MCKEE.

34.

All Defendants were entrusted with decision-making authority regarding inmate classification, inmate dormitory, building, cell and cellmate assignments, housing transfers, creation and / or implementation of customs or policies, subordinate training and discipline, and the safety and protection of inmates, including MCKEE and or were directly involved in the circumstances that resulted in the pain, suffering, degradation, and or death of MCKEE.

35.

Defendant Georgia Department of Corrections (GDC) is the state prison system, an agency of the State of Georgia.  At all times, it operated the Hancock State Prison, a public facility with programs and services for which Charles "Tristen" McKee was otherwise qualified.  GDC is a recipient of federal funds. GDC is sued for compensatory relief herein under federal law.

36.

Defendant Georgia Board of Regents, located in Augusta, is a component of the Augusta University system, a public university in the State of Georgia. Through a subsidiary called Georgia Correctional Health Care (GCHC), the Board is responsible for providing health care, including mental health and psychiatric care, to GDC prisoners, including prisoners at Hancock State Prison, pursuant to a contractual arrangement with GDC.  GCHC is sued herein for compensatory relief under federal law.

**FACTS**

37.

Charles "Tristen" MCKEE was murdered because Defendants were deliberately indifferent to MCKEE's safety and serious medical needs and failed to accommodate MCKEE's mental health and physical disabilities.

38.

Charles "Tristen" MCKEE had a well-documented history of mental illness, self-harm, suicidal ideation, and attempts.

39.

MCKEE's conditions included ADD, ADHD and or Asperger's Syndrome, a form of autism spectrum disorder, which is a developmental disorder.

40.

Charles "Tristen" MCKEE was also diagnosed with gender dysphoria. Prison officials were aware that since the age of 14 years old Charles "Tristen" MCKEE identified as a female and not a male due to a mismatch between MCKEE's gender identity and MCKEE's assigned birth sex.

41.

Charles "Tristen" MCKEE was gay and or bisexual, and therefore meets criteria for "LGBTI" and or gender-nonconforming (GNC).

42.

Charles "Tristen" MCKEE was Caucasian.

43.

Charles "Tristen" MCKEE was 17 years old in 2015 when he was incarcerated for second degree arson and theft by taking.  Within a week of being in a Georgia Prison Charles "Tristen" MCKEE was stabbed in the eye which

resulted in impaired left eye visual acuity due to traumatic maculopathy.  MCKEE was subsequently stabbed many more times.

44.

While incarcerated in a Georgia Prison, Charles "Tristen" MCKEE attempted suicide multiple times and engaged in self-harming behaviors.

45.

MCKEE was not provided appropriate care for these conditions or properly protected while at Hancock State Prison.

46.

While at Hancock State Prison located at 701 Prison Boulevard Sparta, GA 31087, Charles "Tristen" MCKEE was placed in a dorm with Blood gang and gangster disciples members including Cleveland Gary and Darrion Williams who were overtly hostile toward MCKEE.

47.

Hancock State Prison officials knew that Blood gang and gangster disciples members including Cleveland Gary and Darrion Williams hate and do not tolerate the presence of persons categorized as LGBT or GNC.

48.

On October 11, 2017, four inmates at Hancock State Prison, all Blood gang members, stabbed and murdered inmate Bobby Ricks because he was engaging in homosexual activity, which is against the gang's code.

49.

When Charles "Tristen" MCKEE was escorted by Hancock State Prison officials including Officer Calpurnia Washington into the predominantly Blood gang affiliated dorm / pod, Blood gang and gangster disciples member inmates including Cleveland Gary and Darrion Williams audibly stated "don't put another white faggot in here".

50.

On May 2, 2022, and both before and after, prison officials were aware Charles "Tristen" MCKEE had concern for his safety due to "stressful dorm environment".

51.

MCKEE had previously informed Defendants he could not live safely in this dorm and had received specific threats to his life and safety.

52.

Prison officials, including Defendants, were aware of the dangerous nature of this environment for a Caucasian, LGBTI inmate, with gender dysphoria before May 2, 2022, and after. Defendants were aware Cleveland Gary and Darrion Williams were harassing, intimidating, and would target MCKEE.

53.

Prison officials, including Defendants, were aware that LGBTI inmates had been tortured and killed for being LGBTI and that MCKEE identified as such.

54.

Prison officials were also aware that due to Charles "Tristen" MCKEE's developmental disorder that he had poor problem solving and poor judgment, and that he was nearly blind in one eye.

55.

There was no segregation of nonviolent inmates from violent inmates.

56.

There was no segregation of inmates with mental disorders from those without mental disorders.

57.

Depending on current events, prisons place inmates on lockdown or increase

alert status to high alert in order to prevent serious incidents and violence from

occurring.

58.

On May 14, 2022, a white supremacist racially motivated mass

shooting terrorist attack in Buffalo, New York resulted in the murder of 10 Black

people and multiple others wounded.

59.

Prisons across the country went on high alert and or lockdown to de-escalate

potentially violent retaliations by Black inmates against Caucasian inmates, for the

horrific Buffalo incident.

60.

Hancock State Prison did not take this threat seriously and did not protect

Caucasian inmates from reprisal attacks.

61.

Inmates in E1 dorm were allowed to roam freely at all hours of the day.

62.

Defendants allowed inmates to fashion homemade weapons, import weapons

from outside the Prison, and stockpile weapons.

63.

Defendants did not perform adequate searches and or shakedowns of inmates' possessions to seize weapons.

64.

Cells were not adequately visually inspected and Defendants failed to oversee, supervise, and properly ensure safety of inmates.

65.

MCKEE was aware of the threat and informed Defendants he needed a protected environment rather than be placed into the hostile dorm.

66.

Indeed, soon after the Buffalo incident, on May 22, 2022, despite recognizing the minimum number of officers required on duty to be 36, Hancock State Prison fielded only 7 officers on duty that day and night.

67.

Hancock State Prison was routinely understaffed.

68.

At around 7pm on May 22, 2022 Blood gang and gangster disciples members including Cleveland Gary and Darrion Williams attacked Charles "Tristen" MCKEE with sharp weapons and stabbed MCKEE approximately twelve (12) times, in broad daylight.

69.

The incident was later described as a "bloodbath".

70.

There was no staff in the control booth or anywhere in eye-sight or ear-shot.

71.

Prior to the attack officers were not performing adequate and timely head counts of inmates to ensure sure inmates were all accounted for and behaving appropriately, and aware they were being observed.

72.

According to the Post Assignment Roster for May 22, 2022 Second Shift Officer Stephanie Macklin was supposed to be in E Control at the time of the attack on MCKEE.

73.

Officer Stephanie Macklin was not in E Control at the time of the attack on MCKEE and no other prison official was anywhere around the dorm acting to prevent the brazen and despicable attack on the defenseless MCKEE.

74.

In the face of deliberate indifference and absence of protection from Defendants, fellow inmate Stanley Brooks attempted to assist MCKEE.  In so doing, Stanley Brooks was stabbed in the eye.

75.

Prison officials did not respond to the shouting and pleas for help until well after MCKEE lost significant quantities of blood.

76.

MCKEE's cell mate and friend James Hamack held MCKEE's wounds and attempted to apply pressure to them while waiting for officers to arrive.

77.

Officers did not show up for approximately 45 minutes.  The attacking inmates themselves attempted to clean MCKEE's cell with soap and towels, thereby obscuring and tainting evidence of their crime.

78.

Due to the lack of officers on-scene and at Control and the lack of proper training, Charles "Tristen" MCKEE was pronounced dead at approximately 1:17 am on May 23, 2022.

79.

MCKEE was 24 years old.

80.

Cleveland Gary and Darrion Williams were subsequently arrested for murdering Charles "Tristen" MCKEE.

81.

Cleveland Gary and Darrion Williams were known Blood gang and gangster disciples members who prison officials were aware had the tendency and proclivity to be violent and had on prior occasions threatened the safety and well-being of Charles "Tristen" MCKEE and others.

82.

Despite warnings that Charles "Tristen" MCKEE was in harm's way, Defendants were deliberately indifferent to and ignored the serious and known threats.

83.

Defendants knew that MCKEE faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it or prevent it.

84.

The Prison was not operated in accordance with written policies.

85.

Plaintiff (MCKEE's mother) spoke to Warden Ivey on the morning of May 23, 2022 and was told that her son had been in an altercation and succumbed to his injuries in the shower.  This was inaccurate.

86.

Plaintiff (MCKEE's mother) has asked Defendants for information about the incident including for surveillance of the incident but has been denied surveillance footage.  According to reports there are four (4) cameras in the unit.

87.

Multiple people in addition to MCKEE have been killed at Hancock State Prison due to Defendants failure to provide appropriate protection for inmates and even individuals involved in the incident in which MCKEE was killed have subsequently been murdered including Nathan Michael Mahan.

88.

Other individuals killed at Hancock State Prison due to Defendants failure to protect them in Bobby Ricks, who was murdered at Hancock State Prison on October 11, 2017.

89.

On July 7, 2019, Gerald Florence, Jr was killed at Hancock State Prison.

90.

Cesar Arnold Pastrana was murdered March 13, 2020 at Hancock State Prison.

91.

Xaysana Thao died December 20, 2020 at Hancock State Prison.  Xaysana

Thao was 40 years old.

92.

On January 4, 2021, Rashad Bolton was murdered at Hancock State Prison.

93.

On February 12, 2021, Dwayne Zachery was murdered at Hancock State

prison.

94.

Antione Bush died at Hancock State Prison on June 18, 2022. Antione Bush

was 32 years old.

95.

Terry Bishop was murdered October 18, 2022 at Hancock State Prison.

96.

Zackery Brown died at Hancock State Prison on December 23, 2022.

97.

Norman Samples died December 27, 2022 at Hancock State Prison.

98.

Following years of reports of routine violence and abuse in Georgia prisons,

in September 2021 the U.S. Department of Justice (DOJ) launched a new civil

rights investigation into Georgia's detention facilities.  This became the second ongoing DOJ probe into the Georgia Department of Corrections (GDC), along with an investigation launched in 2016 amid multiple lawsuits alleging that GDC was mistreating LGBTQ prisoners.

99.

Pursuant to the Civil Rights of Institutionalized Persons Act (CRIPA), 42 USC § 1997, the Civil Rights Division of the DOJ and the US Attorney's Office for the Northern, Middle, and Southern Districts of Georgia are conducting an investigation focused 1) on whether GDC adequately protects incarcerated persons from physical harm at the hands of other incarcerated persons and 2) whether GDC adequately protects incarcerated persons who are lesbian, gay, bisexual, transgender, and intersex from abuse and assault.

100.

Despite DOJ investigations, conditions inside Georgia prisons have only further deteriorated.

101.

In a petition filed in federal court last March 2022, the DOJ accused GDC of denying investigators access to facilities and refusing to release even top-line figures about the number of people killed in state prisons.

102.

A Protective Order was recently entered on April 26, 2023 governing the

transmission of confidential documentation between GDC and DOJ.

**COUNT ONE**
**42 USC § 1983 CLAIM FOR VIOLATING MCKEE'S RIGHT TO BE FREE**
**FROM CRUEL AND UNUSUAL PUNISHMENT**

103.

Plaintiff re-alleges the foregoing as if fully set forth herein.

104.

The incorporated facts and allegations of allowing and enabling MCKEE to

be maliciously, sadistically, inhumanely and brutally attacked violate MCKEE's

clearly established rights under the Eighth and Fourteenth Amendments to the US

Constitution.

105.

Defendants' conduct in allowing this attack evidenced a disdainful

shameless disregard for MCKEE's constitutional right to be free from cruel and

unusual punishment.

106.

Considering the number of murders and stabbings at Hancock State Prison

as described in this Complaint, serious inmate-on-inmate violence was the norm or

something close to it.  In other words, this was no occasional, isolated attack, the

extensive history of violent encounters evidence Defendants fostered an environment of extreme violence.

107.

Defendants were aware of the many deficiencies including in failing to perform shake downs and searches, in allowing weapons, in minimizing staff, in failing to monitor inmates and failing to do timely head counts, and in allowing openly hostile inmates who had threatened LGBTI inmates and specifically threatened MCKEE, to be unsupervised, with weapons, in MCKEE's presence during a time of obvious concern over retribution for the racist Buffalo attack. Defendants deliberate indifference to these clear and substantial risks led to the brutal attack of MCKEE and subsequent death.

108.

Consequently, Plaintiff is entitled to all permissible damages, including punitive damage to deter future Eighth Amendment violations at this institution.

**COUNT TWO**
**42 USC § 1983 CLAIM FOR DELIBERATE INDIFFERENCE**
**AND FAILURE TO PROTECT**

109.

Plaintiff re-alleges the foregoing as if fully set forth herein.

110.

The Eighth Amendment to the United States Constitution and 42 USC §1983 impose a duty on prison officials employed by GDC to "protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994); see also, LaMarca v. Turner, 995 F.2d 1526, 1535 (11th Cir. 1993) holding that an "unjustified, constant and unreasonable exposure to violence" violates the Eight Amendment.

111.

Defendants knowingly failed to take reasonable steps to protect MCKEE from violence at the hands of other prisoners who were biased against LGBTI inmates and specifically threatened MCKEE and failed to eliminate MCKEE's constant and unreasonable exposure to violence at the hands of other prisoners who openly and audibly threatened MCKEE.

112.

Officials are liable for abuse of inmates when "the official knows of and disregards an excessive risk to inmate health or safety."

113.

An excessive risk exists when an inmate belongs to "an identifiable group of people who are frequently singled out for violent attack by other inmates."

114.

Defendants knew of multiple categories and indicators that singled MCKEE out for hostility, hatred, retribution, and attack yet disregarded those risks.

115.

Numerous courts have found that an inmate's LGBTI status or gender nonconformity alone may be sufficient to put agency officials on notice of that individual's vulnerability and need for protection.

116.

Failure to take adequate protective measures in the face of this vulnerability can and generally does constitute deliberate indifference.

117.

Defendants' failure to take reasonable action to protect MCKEE from known risks of serious harm amounted to deliberate indifference in violation of the Eighth Amendment and is cruel and unusual punishment and proximately caused MCKEE's death.

**COUNT THREE**
**42 USC § 1983 CLAIM FOR FAILURE TO INTERVENE TO PREVENT CIVIL RIGHTS VIOLATIONS**

118.

Plaintiff re-alleges the foregoing as if fully set forth herein.

119.

At all relevant time, Defendants were charged with the constitutional duties of protection and with the duty to not knowingly, with wanton disregard, cause an inmate's life, health and safety to be placed in danger by intentionally or deliberately ignoring the known dangers that their actions placed MCKEE in.

120.

Each Defendant had sufficient time and opportunity to so intervene and prevent MCKEE's injuries.

121.

Failure to do so resulted in injuries and damages alleged herein.

**COUNT FOUR**
**42 USC § 1983 CLAIM FOR DELIBERATE INDIFFERENCE**
**TO SERIOUS MEDICAL NEEDS**

122.

Plaintiff re-alleges the foregoing as if fully set forth herein.

123.

Failure to provide individualized and appropriate medical care for inmates suffering from gender dysphoria violates the Eighth Amendment's prohibition on cruel and unusual punishment and constitutes deliberate indifference to serious medical needs.  Estelle v. Gamble, 429 U.S. 97, 104 (1976); Kothmann v. Rosario, 558 F. App'x 907, 910 (11th Cir. 2014); Fields v. Smith, 653 F.3d 550, 554-55

(7th Cir. 2011); Lynch v. Lewis, No. 7:14-CV-24, 2014 WL 1813725, at *2 (M.D. Ga. May 7, 2014)

124.

Gender dysphoria is listed in the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (DSM-V) as a major mental illness and characterized by a marked incongruence between one's experienced/expressed gender and assigned gender at birth. Gender dysphoria involves a persistent physical and emotional discomfort with one's biological sex. Left untreated, that discomfort can become so painful that individuals consider or attempt suicide, self-castration, or self-mutilation.

125.

GDC Standard Operating Procedures and Policy on Mental Health Evaluations at Policy Number 507.04.50 considers gender dysphoria to be a "Serious Mental Illness".

126.

The same Policy requires treatment and management of developmental disorders.

127.

GDC has a specific Standard Operating Procedures and Policy on Management and Treatment of Gender Dysphoria, Policy Number: 507.04.68.

128.

Section IV. A. 2. States "When making housing and programming assignments, the medical, mental health, and facility staff shall consider on a case-by-case basis whether a placement would compromise the offender's health and safety and any management or security concerns".

Defendants failed to appropriately carry out this Policy.

129.

Defendants were required pursuant to Policy to evaluate, refer, and or adequately treat MCKEE.

130.

Defendants' reaction to MCKEE's self-harm was to tell MCKEE to wash the wounds with soap and water.  This was completely inadequate for treatment for the underlying condition that caused the self-harm.

131.

MCKEE also missed multiple medical appointment because MCKEE had no escort to multiple medical appointments.

132.

Courts have recognized that inmates with gender dysphoria have a serious medical condition and that failure to adequately treat inmates with this condition is a violation of the Eighth Amendment.

133.

MCKEE did not receive adequate individualized care for his conditions, which proximately caused MCKEE harm, injury, pain, suffering, and degradation.

**COUNT FIVE**
**42 U.S.C. § 1983 (Monell Liability) CLAIM**
**GDC HAS A DE FACTO POLICY OF IMPROPERLY STAFFING AND MISMANAGING HANCOCK STATE PRISON**

134.

Plaintiff re-alleges the foregoing as if fully set forth herein.

135.

GDC has created a dangerous, degrading, and inhumane environment for incarcerated individuals by failing to address staffing and mismanagement problems that they have known about for years.

136.

The GDC has known for years that GDC facilities such as Hancock State Prison are improperly staffed, are in disrepair, and are dangerous and inhumane.

137.

The result of years of neglect and poor management, as well as the overreliance on uniformed staff who lack effective leadership—has inevitably caused untold suffering, violating the rights of MCKEE.

138.

According to reports of individuals who worked at Hancock State Prison:

"There was a shortage of officers, and that made it even more dangerous.  Imagine being in a dorm by yourself with 96 inmates on each side of the dorm and only one officers.  You really have to be aware of your surroundings.  There is always fights and tension between the inmates.  Management is terrible.  The sergeants, lieutenants, unit managers, and higher management are petty, and play favorites with the officers.  They let some officers break rules and get away with it".

139.

Another individual who worked at Hancock State Prison states:

"It is a very unsafe place for anybody.  A lot of guards are paid off by inmates.  Nobody works together as a team.  Rules are always broken and the inmates are very dangerous with weapons."

140.

Correction officers and prison officials are improperly and inadequately trained, and they are also severely mismanaged.

136.

These leadership failures exist through the hiring process, training, supervision, and discipline of officers.

138.

Moreover, uniformed staff are under-supervised and are rarely held accountable for wrongdoing

139.

Uniformed staff stand by and merely observe the chaos, either out of sheer fear of intervening or callousness toward the state of affairs at the Prison.

141.

The classification system—a method by which the facilities separate detainees with prior violent histories with one another or who are affiliated with rival gangs—is in disarray and or has all but disappeared.  Staff and guards are ignoring affiliations, placing persons who have been ordered separate into the same dorms or even the same cells, leading to violent outbursts and serious injuries to inmates and guards alike.

142.

The high rate of staff absenteeism is exacerbating these long-standing problems. In some spaces, there are no guards to be found, leaving inmates vulnerable to attacks, unable to call for help, and isolated in the case of a medical emergency.  This is what happened to MCKEE.

143.

It appears some guards are not just providing inmates permission but are actively involved in providing weapons, and are instigating violence and further contributing to disorder.  Officers have ceased confiscating weapons altogether, despite multiple stabbings and deaths.  These are *examples* of improper staffing.

144.

Inadequacies in the provision of medical care are also directly attributed to the problem of improper staffing and absenteeism and mismanagement.

145.

Even when inmates have managed to schedule medical appointments, many are unable to attend them because there are not enough correctional officers to escort them through the facility to the medical unit. Where escorts are not available, individuals inmates are simply unable to access routine as well as emergency health services.

146.

MCKEE had no escort to multiple medical appointments and therefore was deprived medical and mental health treatment for serious medica and mental health needs.

147.

Delays in accessing medical care have heightened the risk of serious, lasting physical injury as well as self-harm.

148.

The driving force behind this rapid decline is the GDC's persistent failure to screen correction officers before they are hired and train employed officers on how to keep incarcerated individuals safe and ensure that inmates receive the care and services to which inmates are constitutionally entitled.

**COUNT SIX**
**42 U.S.C. § 1983 (Monell Liability) CLAIM**
**DEFENDANTS HAVE ENGAGED IN A CUSTOM AND POLICY THAT OBSCURES THE LEVEL OF HARM EXISTENT BY IGNORING VIOLENCE AND OR INACCURATELY CLASSIFYING VIOLENT ACTS AND CAUSES OF DEATH THAT OCCUR IN HANCOCK STATE PRISON**

149.

Plaintiff re-alleges the foregoing as if fully set forth herein.

150.

Defendants have classified inmates' death as "natural" or "undetermined" when such deaths are in fact homicides.

151.

Defendants do not consistently and reliably classify either the causes of death or number of acts of violence in reporting to government agencies.

152.

Due to lax supervision, Defendants often fail to observe the violent incidents and only discover the victim after the violence and or injuries occur.

153.

Defendants also sometimes watch a violent or troubling incident unfold and do not intervene.

154.

Defendants, through their actions and omissions, fail to adequately prevent the introduction of illegal contraband and dangerous weaponry, and then when violence and or injury occurs, deceptively claim ignorance of the circumstances Defendants contributed to.

155.

This unlawful custom and policy led to, caused and or contributed to the injuries and death of MCKEE.


**COUNT SEVEN**
**SUPERVISORY LIABILITY (Canton Liability) CLAIM**

156.

Plaintiff re-alleges the foregoing as if fully set forth herein.

157.

Defendants by and through their acts and omissions have failed to
implement meaningful accountability measures and have failed to conduct
thorough investigations into acts of violence.

158.

Supervisory liability under 42 USC § 1983 occurs when the supervisor
personally participates in the alleged constitutional violation or when there is a
causal connection between the actions of the supervising official and the alleged
constitutional deprivation.

159.

The supervisor Defendants ratified the actions and omissions of the other
Defendants by failing to take reasonable steps to immediately intervene to remedy
the constitutionally infirm conditions that led to the inadequate mental health
treatment MCKEE was subjected to, the stockpiling of dangerous materials, and
failed to prevent the placement of MCKEE in immediate jeopardy.

160.

The supervisor Defendants moreover were unwilling, incapable, and or
refused to take action to supervise their underlings and direct Defendants to
actively intervene, deter, reasonably respond to and protect inmates from violence
at the hands of other prisoners.

161.

The supervisor Defendants fostered an unreasonable environment of violence which environment motivated and encouraged inmates to commit violence against each other and which resulted in MCKEE's murder.

**COUNT EIGHT**
**VIOLATIONS UNDER THE AMERICANS WITH DISABILITIES ACT**

162.

Plaintiff re-alleges the foregoing paragraphs as if fully set forth herein.

163.

GDC and GCHC were at all relevant times, recipients of federal funds, and thus covered by the mandates of the Rehabilitation Act.  The Rehabilitation Act requires recipients of federal funds to reasonably accommodate persons with mental disabilities in their facilities, program activities, and services, and to reasonably modify such facilities, programs and services to accomplish this purpose.  29 USC § 794.

164.

Title II of the ADA applies to GDC and GCHC and includes the same mandate as the Rehabilitation Act.  42 USC § 12131 *et seq*.

165.

Hancock State Prison is a facility, and its operation comprises a program and service for Rehabilitation Act and ADA purposes.

166.

For purposes of the ADA and Rehabilitation Act, MCKEE was a qualified

individual regarded as having a mental impairment that substantially limited one or

more major life activities.  Defendants GDC and GCHC knew MCKEE was a

person with mental illness and disabilities.

167.

Despite this knowledge, Defendants intentionally discriminated against

MCKEE and failed to accommodate MCKEE, failed and refused appropriate

medical care, and failed to provide safe housing for MCKEE's circumstances.

168.

Those failures proximately caused the conditions that led to, caused, and or

contributed to MCKEE's death.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for damages and request the Court:

a. Allow a trial by jury on all issues so triable;

b. Award Plaintiff compensatory and punitive damages;

c. Grant costs of this action, interest, and attorneys' fees per 42 U.S.C. § 1988;

d. Award further relief as the Court deems equitable, proper, and just.

Respectfully submitted this 29th day of August, 2023

**ERIC J. HERTZ, PC**

*/s/ Eric J. Hertz*
Eric J. Hertz
Georgia Bar Number 349501
*hertz@hertz-law.com*
Jeffrey E. Gewirtz
GA State Bar No. 292434
*jeff@hertz-law.com*
8300 Dunwoody Pl. Suite 210
Atlanta, GA 30350
(404) 577-8111
Fax: (404) 577-8116
*Counsel for Plaintiffs*