**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **LISA SPRADLIN Individually and as Administrator of the Estate of CHARLES TRISTEN MCKEE,** | ) ) ) ) |
| **Plaintiff,** | ) ) ) |
| **v.** | )    **CIVIL ACTION NO. 5:23-cv-328 (MTT)** ) |
| **Warden ANNETTIA TOBY, *et al.*,** | ) ) ) |
| **Defendants.** | ) ) ) |

## ORDER

Plaintiff Lisa Spradlin, individually and as administrator of the estate of Charles Tristen McKee, alleges that the defendants violated the Eighth Amendment, the Americans with Disabilities Act ("ADA"), the Rehabilitation Act ("Rehab Act"), and Georgia state law by failing to provide medical treatment for McKee's mental health conditions and failing to protect McKee from an inmate assault while incarcerated at Hancock State Prison ("HSP").  Doc. 45.  Defendants MHM Correctional Services LLC ("MHM"), Sandra Roberts, the Georgia Department of Corrections ("GDC"), and the Board of Regents of the University System of Georgia ("the Board of Regents") move to dismiss.[1]  Docs. 44; 48.  For the reasons that follow, MHM's and Roberts' motion to dismiss (Doc. 44) is **GRANTED in part** and **DENIED in part** and the GDC's and the Board of Regents' motion to dismiss (Doc. 48) is **GRANTED**.

---

[1] The remaining 24 defendants have not moved to dismiss.  *See* Doc. 45 ¶¶ 8-31.

## I. BACKGROUND

Spradlin's 69-page, 12-count amended complaint is difficult to parse.  Doc. 45.
The amended complaint transforms what appears to be compelling core facts into a
mush of confusing, and in part unnecessary, claims.  From what the Court can decipher,
Spradlin alleges two categories of facts to support her claims.  First, Spradlin alleges
"mental health" facts describing McKee's disabilities and the defendants' failure to
provide adequate care to treat those disabilities.  *See id.* ¶¶ 58-91.  Second, Spradlin
alleges "prison" facts describing the allegedly dangerous conditions at HSP and the
defendants' failure to protect McKee from those conditions.  *See id.* ¶¶ 92-161.

**A. Mental Health Treatment**

MHM provided mental and behavioral health services for the GDC.  *Id.* ¶ 32.
Roberts, a mental health unit manager and MHM employee, was responsible for
McKee's mental health treatment.  *Id.* ¶ 35.  McKee's conditions included gender
dysphoria, ADD, ADHD, and Asperger's Syndrome.  *Id.* ¶¶ 48-55.  Additionally, McKee
had a "history of mental illness, self-harm, suicidal ideation, and attempts."  *Id.* ¶ 48.  To
treat his mental health conditions, McKee was frequently placed in administrative
segregation.  *Id.* ¶¶ 62-63, 65.  Spradlin alleges that McKee's prolonged placement in
restricted housing "led to the decline of his mental health" and that "McKee should have
been transferred to a mental health hospital."  *Id.* ¶ 75.

In support of her assertion that Roberts and MHM were aware that McKee's
mental health was deteriorating, Spradlin cites the following incidents:

- On December 13, 2021, Roberts noted that McKee was cutting himself with glass
  and that McKee "said [he] felt like he was 'losing it' and [began] to act out" and
  stated he "need[ed] to see psychiatry."  *Id.* ¶ 69.

- Sometime after the December 2021 self-harm incident, McKee was prescribed Celexa. *Id*. ¶ 70. However, a "medication non-adherence form" from April 11, 2022, indicated that McKee "missed 22 does of Celexa from March 1, 2022, through March 31, 2022." *Id*. ¶ 76.

- On May 2, 2022, "a nursing assessment for Skin Wounds" reported that McKee "suffered a self-inflicted laceration to his arm." *Id*. ¶ 78. McKee was instructed not to cut himself. *Id*.

- On May 2, 2022, Roberts "signed a 'Suicide Precaution Initial Treatment Plan' and circled in the Goal section: 'Physical safety; Decrease suicide risk factors; Increase in protective factors; [and] Return to daily activities.'" *Id*. ¶ 79. Roberts marked the following in the "Risk Factors" section of the form with an "x": "Resolved Plans and Preparation," "Fearlessness of physical pain/injury/death," "Availability of means and opportunity," "Specificity of Plan," "Preparation for attempt." *Id*. The "Suicidal Desire and Ideation" section was marked with an "x" by "Talk of death and/or suicide." *Id*.

- On May 2, 2022, Roberts "noted McKee had 'swallowed razor 10/20/20,' 'cut left arm 11/10/20,' 'allegedly swallowed a razor 3/11/21,' and 'cut arm w/glass 12/13/21.'" *Id*.

- On May 3, 2022, and May 10, 2022, "Progress Records" stated McKee was "unable to be seen due to no security." *Id*. ¶¶ 80, 84.

- On May 5, 2022, Roberts marked an "x" in an "Assessment section which ask[ed] 'Are there any contra-indications to the lock-down'" and noted that McKee "did not respond after the therapist knocked on the door several times." *Id*. ¶ 81. Roberts stated in the "Plan section" that "As long as the inmate/probationer remains in isolation or Segregation will monitor weekly for contra-indications to lock-down and the need for further services." *Id*.

- On May 15, 2022, McKee engaged in additional incidents of self-harm. *Id*. ¶ 86.

## B. Inmate Attack and Prison Conditions

"Late at night on May 18, 2022 or in the early hours of May 19, 2022, McKee was released" from administrative segregation "and placed in Dorm E-1." *Id*. ¶ 87. "At around [7:00] pm on May 22, 2022, Blood gang and gangster disciple[] members, including Cleveland Gary and Darrion Williams, attacked [McKee] with sharp weapons and stabbed McKee approximately twelve times." *Id*. ¶ 127. Approximately 45 minutes

after the attack, officers arrived on the scene. *Id*. ¶ 136.  McKee "was pronounced dead at approximately 1:17 am on May 23, 2022." *Id*. ¶ 137.

Spradlin alleges that McKee's transfer from administrative segregation to Dorm E-1 put his safety at risk for the following reasons.  First, Dorm E-1 housed "Blood gang and gangster disciple members … who were overtly hostile toward McKee" because he identified as LGBTI and gender nonconforming. *Id*. ¶¶ 92, 94.  Second, McKee's "developmental disorder," "poor problem solving," "poor judgment," and impaired vision made him more susceptible to attack. *Id*. ¶ 101.  Third, the May 14, 2022 "white supremacist racially motivated mass shooting terrorist attack in Buffalo, New York" exacerbated racial tensions and the defendants did not take action to protect white inmates, like McKee, from reprisal attacks. *Id*. ¶¶ 109-11, 123.  Fourth, inmates in Dorm E-1 "were allowed to roam freely at all hours of the day." *Id*. ¶ 112.  Finally, HSP was understaffed which impacted the defendants' ability to perform "adequate and timely head counts," conduct "adequate searches," "shakedowns," and "inspect[ions]" to seize weapons, and provide timely assistance in the event of an emergency. *Id*. ¶¶ 124, 113-15, 130.

Spradlin claims Roberts "was aware of McKee's housing change" because she was responsible for follow-up care and management" under GDC Standard Operating Procedure ("SOP") 508.28[2] and "had authority to place McKee in and remove McKee from restrictive housing" based on SOP 209.06.[3] *Id*. ¶¶ 83, 88, 93, 91.  Furthermore,

---

[2] SOP 508.28 § 3(H)(13) provides that "Mental Health staff will be responsible for coordinating appropriate follow-up care and management."  Doc. 45 ¶ 83.

[3] SOP 209.06 § 3(A) provides that "[t]he Classification Committee, Deputy Warden/Assistant Superintendent/Unit Manager, or in an emergency, the Warden/Superintendent may place in Administrative Segregation an offender whose continued presence in the general population poses a

Spradlin claims that Roberts was aware of the threat that reassignment to Dorm E-1 posed to McKee's safety because on May 2, 2022, she signed a "Suicide Precaution Initial Treatment Plan," which marked "Stressful dorm environment with concerns for safety" as a "Current and Recent (within past 6 months) Stressor[]." *Id*. ¶ 79.

Finally, Spradlin alleges that all defendants generally were on notice of the dangerous conditions at HSP based on the death of 10 other inmates that occurred from 2017 to 2022. *Id*. ¶¶ 146-56.

**C. Procedural History**

Spradlin's amended complaint alleges twelve claims, the first seven of which are brought pursuant to 42 U.S.C. § 1983. Counts One and Two are claims under the Eighth Amendment for the alleged failure to protect McKee from the May 22, 2022 assault. *Id*. ¶¶ 162-76. Count Three is an Eighth Amendment failure to intervene claim, presumably based on the 45-minute delay between the attack and the prison officials' response. *Id*. ¶¶ 177-80; *see also id*. ¶¶ 135-36. Count Four is a claim under the Eighth Amendment for the alleged deliberate indifference to McKee's mental health needs. *Id*. ¶¶ 181-93. Counts Five and Six are municipal liability claims pursuant to *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978), based on allegedly improper policies with respect to staffing, management, and security or safety in the state prisons. *Id*. ¶¶ 194-215. Count Seven is a supervisor liability claim under the Eighth Amendment for the alleged failure to protect McKee from the assault by other inmates. *Id*. ¶¶ 216-21. Count Eight alleges a claim under Title II of the ADA against the GDC and Board of Regents and Count Nine alleges a claim under Section 504 of the Rehab Act against

---

serious threat to life, property, self, staff, or other offenders, or to the security or orderly running of the facility." Doc. 45 ¶ 59.

the GDC only.  *Id*. ¶¶ 222-34.  Count Ten is a Title III ADA claim against MHM.  *Id*. ¶¶ 235-39.  Finally, Counts Eleven and Twelve allege wrongful death and negligence claims against MHM and Roberts.  *Id*. ¶¶ 240-47.

MHM and Roberts move to dismiss Counts One, Two, Three, Four, Six, Seven, and Ten.  Doc. 44.  The GDC and Board of Regents move to dismiss Counts One through Nine.  Doc. 48.

## II. STANDARD

The Federal Rules of Civil Procedure require that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To avoid dismissal pursuant to Rule12(b)(6), "a complaint must contain sufficient factual matter … to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when "the court [can] draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. "Factual allegations that are 'merely consistent with a defendant's liability' fall short of being facially plausible."  *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678).

At the motion to dismiss stage, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff."  *FindWhat Inv. Grp. v. FindWhat.com.*, 658 F.3d 1282, 1296 (11th Cir. 2011) (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006)).  But "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal."  *Oxford Asset Mgmt., Ltd. v. Jaharis*,

297 F.3d 1182, 1188 (11th Cir. 2002).  The complaint must "give the defendant fair notice of what the … claim is and the grounds upon which it rests."  *Twombly*, 550 U.S. at 555.  Where there are dispositive issues of law, a court may dismiss a claim regardless of the alleged facts.  *Patel v. Specialized Loan Servicing, LLC*, 904 F.3d 1314, 1321 (11th Cir. 2018).

### III. DISCUSSION

**A. Claims Against Defendant Roberts**

*1. Counts One and Two: Failure to protect*

Under the Eighth Amendment, prison officials have a duty to "take reasonable measures to guarantee the safety of the inmates."  *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir.2014); *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) ("A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment.").  To state a claim for deliberate indifference to an inmate's safety, a plaintiff must plausibly allege: (1) a substantial risk of serious harm; (2) deliberate indifference to that risk; and (3) causation.  *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 (11th Cir. 2013); *Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312, 1320 (11th Cir. 2016).

"The first element of an Eighth Amendment claim—a substantial risk of serious harm—is assessed under an objective standard."  *Lane v. Philbin*, 835 F.3d 1302, 1307 (11th Cir. 2016).  To prevail, a plaintiff must allege "conditions that were extreme and posed an unreasonable risk of serious injury to his future health or safety."  *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019) (quoting *Lane,* 835 F.3d at 1307). Plaintiffs can make this showing by demonstrating either a "general threat" to inmates

based on dangerous conditions in the prison or particular area of the prison, or by an individualized risk based on a "specific threat" to the prisoner. *Marbury*, 936 F.3d at 1233, 1235; *see also Purcell ex rel. Est. of Morgan v. Toombs County, Ga.*, 400 F.3d 1313, 1320 (11th Cir. 2005).

To establish the second element—deliberate indifference—a plaintiff must plausibly allege that the defendant: (1) "was subjectively aware that the inmate was at risk of serious harm"; (2) "disregarded that risk"; and (3) "acted with 'subjective recklessness as used in the criminal law.'" *Wade v. McDade*, 106 F.4th 1251, 1255 (11th Cir. 2024) (quoting *Farmer*, 511 U.S. at 839). Subjective awareness requires that the defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 617 (11th Cir. 2007) (citing *Farmer*, 511 U.S. at 837). The determination of whether a risk has been disregarded is objective: "[T]he [defendant] must have responded to the known risk in an unreasonable manner." *Marbury*, 936 F.3d at 1233; *Wade*, 106 F.4th at 1262. In other words, "a defendant who 'respond[s] reasonably' to a risk, even a known risk, 'cannot be found liable' under the Eighth Amendment." *Wade*, 106 F.4th at 1255 (quoting *Farmer*, 511 U.S. at 837) (internal citation omitted). To establish that "the defendant acted with 'subjective recklessness as used in the criminal law'" the plaintiff must allege "that the defendant was subjectively aware that his own conduct put the plaintiff at substantial risk of serious harm." *Id.*

"Finally, the plaintiff must show a 'necessary causal link' between the defendant's failure to act reasonably and the plaintiff's injury." *Marbury*, 936 F.3d at 1233 (quoting

*Rodriguez*, 508 F.3d at 623).  This causal connection requires that the defendant "(1) had the means substantially to improve the inmate's safety, (2) knew that the actions he undertook would be insufficient to provide the inmate with reasonable protection from violence, and (3) had other means available to him which he nevertheless disregarded." *Nelson v. Tompkins*, 89 F.4th 1289, 1298 (11th Cir. 2024) (quoting *Rodriguez*, 508 F.3d at 622).

Spradlin's amended complaint alleges two failure to protect claims based on the May 22, 2022 assault.  Doc. 45 ¶¶ 162-80.  Count One alleges a "generalized risk" of harm claim based on the "number of murders and stabbings" at HSP, such that "serious inmate-on-inmate violence was the norm or something close to it."  *Id*. ¶ 165. Count Two alleges a "specific risk" of harm claim from inmates who were "biased against LGBTI inmates and specifically threatened McKee."  *Id*. ¶ 170.  Roberts contends that there are insufficient factual allegations to demonstrate that she "knew or was in a position to know about any substantial risk [of] serious harm" from the inmates at HSP or specifically in Dorm E-1 because she "was only responsible for mental care and treatment."  Doc. 44-1 at 9.  The Court agrees.  Even assuming Spradlin has alleged a substantial risk of serious harm, she has not alleged facts supporting her assertion that Roberts was deliberately indifferent to that risk or causation.

First, the Court notes that the factual allegations of Roberts' knowledge center on McKee's mental health treatment—not the May 22, 2022 attack.  *See id*. ¶¶ 64, 66-69, 79, 81-83, 89-91, 97.  And knowledge of allegedly deficient mental health treatment does not equate to knowledge of the risk of harm from an assault by another inmate.  In short, Roberts is lumped in with the other defendants, mainly prison wardens, guards,

and other GDC officials working at HSP, and there are no factual allegations demonstrating how Roberts, who was responsible for mental health care, would be aware of the risk of harm from an inmate assault.

Regarding the generalized threat of harm McKee faced from being incarcerated at HSP, Spradlin alleges that all defendants generally were on notice of the dangerous conditions because 10 other inmates died at HSP from 2017 to 2022.  Doc. 45 ¶¶ 146-56, 166.  But again, there are no factual allegations that *Roberts* was aware of these deaths.  For example, there are no factual allegations that Roberts was employed and working at HSP when the deaths occurred.

Additionally, a "defendant cannot be deliberately indifferent to an excessive risk of inmate violence unless he 'had the capability (authority and means) to provide adequate security and did not do so.'" *Barefield v. Dunn*, 688 F. Supp. 3d 1026, 1075 (M.D. Ala. 2023) (quoting *Williams v. Bennett*, 689 F.2d 1370, 1389 (11th Cir. 1982)).  "That is, '[t]hose whose [ ] indifference results in liability are those under a duty—possessed of authority and means—to prevent the injury.'" *Id*. (quoting *Williams*, 689 F.2d at 1389).  "Therefore, in examining whether [Spradlin] plausibly alleged [that Roberts was] deliberately indifferent to the excessive risk of inmate violence at" HSP "the analysis must also assess the power, authority, discretion, and means held by [Roberts] to take steps to remedy the excessive risk of inmate violence at" HSP.[4]  *Id*.

---

[4] As the Court in *Barefield* notes, "authority and means to remedy the excessive risk of inmate violence bears directly on causation; however, it overlaps with deliberate indifference because an official can rarely manifest a deliberately indifferent state of mind by failing to do something that was not in the official's power to do."  688 F. Supp. 3d at 1075 n.28 (citing *Rodriguez*, 508 F.3d at 622).  Accordingly, the Court considers Roberts' authority and power in both the deliberate indifference and causation prongs of Spradlin's failure to protect claim.

Spradlin alleges no facts supporting her conclusory contention that Roberts had any power, authority, discretion, or means to remedy the excessive risk of inmate violence at HSP.  As the amended complaint makes clear, the generalized risk of violence McKee faced was the result of the failure to perform shake-downs and searches, the proliferation of weapons, understaffing, and the failure to monitor inmates.  Doc. 45 ¶ 166.  Spradlin alleges that Roberts was responsible for McKee's mental health care—nothing more.  *Id*. ¶ 35 ("Defendant Sandra Roberts was at all times relevant herein, an individual residing in the State of Georgia who was responsible for [McKee's] medical and mental health and safety.  Defendant Roberts was at all relevant times a mental health unit manager, a supervisor, and an MHM Employee.").  Because there are no allegations that Roberts had control over staffing levels, weapon searches, or monitoring inmate-on-inmate violence, Spradlin fails to allege that Roberts was deliberately indifferent to the generalized risk of harm McKee faced while housed at HSP.

Regarding the specific threat of harm McKee faced from Dorm E-1, the only factual allegation supporting Spradlin's assertion that Roberts was aware of any allegedly dangerous conditions in Dorm E-1 is a "Suicide Precaution Initial Treatment Plan" from May 2, 2022 where Roberts marked "Stressful dorm environment with concerns for safety" as a "Current and Recent (within past 6 months) Stressor[]."  Doc. 45 ¶ 79.  Spradlin offers no explanation to tie this vague reference to the specific risk that McKee faced in Dorm E-1.  In fact, Spradlin alleges that McKee was in administrative segregation at the time of Roberts' note and nothing suggests her note referred to Dorm E-1 or the violence alleged in the complaint.  *Id*. ¶ 63.

As *Marbury* makes clear, "officials must possess enough details about a threat to enable them to conclude that it presents a 'strong likelihood' of injury, not a 'mere possibility.'" 936 F.3d at 1236 (quoting *Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015); *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990)). "The unfortunate reality is that 'threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm.'" *Id.* (quoting *Prater v. Dahm*, 89 F.3d 538, 542 (8th Cir. 1996)). Applying that principle, the Eleventh Circuit held "Marbury's statement that he had heard from a friend that an unnamed prisoner intended to hurt him, and that he was afraid of being hurt or killed, without any further details," was insufficient "to make the defendants aware of a substantial risk of serious harm." *Id.* That "threat," the Court reasoned, was "precisely [the] type of vague statement that conveys nothing about the nature of the anticipated risk." *Id.* at 1237. Roberts' nonspecific reference to "Stressful dorm environment with concerns for safety" is insufficient to allege subjective knowledge of a specific threat.[5]

Furthermore, Spradlin does not allege facts supporting her conclusory assertion that Roberts possessed "the means to cure" the allegedly dangerous conditions. *LaMarca v. Turner*, 995 F.2d 1526, 1536 (11th Cir. 1993). Spradlin claims Roberts "had authority to place McKee in and remove McKee from restrictive housing" based on SOP 209.06. Doc. 45 ¶ 93. But SOP 209.06 states that the "Classification Committee, Deputy Warden/Assistant Superintendent/Unit Manager, or in an emergency, the

---

[5] Spradlin also claims that because Roberts was "aware of McKee's housing change from Isolation / Segregated / Restrictive Housing to Dorm E1" under SOP 508.28, she possessed subjective knowledge of the specific risk of harm McKee faced in Dorm E-1. Docs. 45 ¶ 88; 49 at 4. But again, knowledge of McKee's reassignment to Dorm E-1 is meaningless without specific factual allegations supporting the inference that Roberts knew the conditions in Dorm E-1 posed a risk of harm to McKee.

Warden/Superintendent"—not a mental health unit manager, such as Roberts—may place an offender in Administrative Segregation—a fact Spradlin acknowledges in her response brief.  Docs. 45 ¶ 59; 49 at 5.  To get around this inconvenient reality, Spradlin argues the Court should infer that Roberts had authority over McKee's housing because the Eleventh Circuit in *Keith v. DeKalb County* noted that "at the Dekalb County Jail 'MHM alone' decided where inmates should be housed."  Doc. 49 at 5 (citing *Keith v. DeKalb Cnty., Georgia*, 749 F.3d 1034, 1040 (11th Cir. 2014)).  But the facts of a different case, involving a different jail, almost 10 years ago have no bearing on the facts Spradlin alleges in the amended complaint before this Court.

Finally, Spradlin has not alleged any facts supporting her assertion that Roberts' deliberate indifference caused McKee's injuries.  To demonstrate a causal connection, Spradlin must plausibly allege that Roberts "(1) had the means substantially to improve [McKee's] safety, (2) knew that the actions [she] undertook would be insufficient to provide [McKee] with reasonable protection from violence, and (3) had other means available to [her] which [she] nevertheless disregarded."  *Nelson*, 89 F.4th at 1298 (quoting *Rodriguez*, 508 F.3d at 622).  As discussed, Spradlin does not allege facts to support her argument that Roberts had control over McKee's housing placement, staffing levels, weapon searches, or monitoring inmate-on-inmate violence.

In sum, Spradlin fails to allege facts demonstrating that Roberts was deliberately indifferent to McKee's safety or that Roberts' action or inaction caused McKee's injuries.  Accordingly, Counts One and Two against Roberts are **DISMISSED**.

### 2. Count Three: Failure to intervene

Spradlin's amended complaint alleges a failure to intervene claim based, presumably, on the May 22, 2022 assault.  Doc. 45 ¶¶ 177-80.  Defendants "may be held directly liable under § 1983 if they fail or refuse to intervene when a constitutional violation *occurs in their presence*."[6]  *Terry v. Bailey*, 376 F. App'x 894, 896 (11th Cir. 2010) (citing *Ensley*, 142 F.3d at 1407) (emphasis added).  "However, in order for liability to attach, the [defendant] must have been in a position to intervene."  *Id*.  Here, there are no factual allegations that Roberts was present during the assault and, thus, she was not in a position to intervene to protect McKee from the assault.  Accordingly, Count Three against Roberts is **DISMISSED**.

### 3. Count Four: Deliberate indifference to medical needs

To establish an Eighth Amendment claim based on inadequate medical care, Spradlin must plausibly allege that Roberts engaged in "acts or omissions sufficiently harmful to evidence deliberate indifference to [McKee's] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  The objective component to deliberate indifference in this context requires that Spradlin plausibly allege an objectively serious medical need—"one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004) (quoting *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003)); *Wade*, 106 F.4th at 1262.

---

[6] The Court assumes that Spradlin can allege a failure to intervene claim based on an inmate assault. *See Murphy v. Turpin*, 159 F. App'x 945, 948 (11th Cir. 2005) (applying deliberate indifference standard to claim that prison official failed to intervene in inmate-on-inmate assault); *but see Johnson v. Boyd,* 568 F. App'x 719, 722 n. 2 (11th Cir. 2014) ("While it is well settled that *Ensley* applies to situations where one officer observes a fellow officer violating a constitutional right, typically by using excessive force, we have not explicitly adopted this holding in a situation involving an officer observing a fight between inmates.") (citing *Ensley v. Soper*, 142 F.3d 1402, 1407 (11th Cir. 1998)).

Second, Spradlin must allege that Roberts acted with deliberate indifference to McKee's serious medical need by demonstrating that Roberts was subjectively aware that her own action or inaction caused a substantial risk of serious harm to McKee and that Roberts unreasonably disregarded that risk. *Wade*, 106 F.4th at 1262. If Roberts acted reasonably, she cannot be held liable under the Eighth Amendment. *Id*.

Roberts argues that Spradlin fails to allege a deliberate indifference claim based on inadequate mental health care because (1) there is no nexus between the alleged inadequate mental health treatment and any injury to McKee and (2) there are no factual allegations supporting Spradlin's contention that Roberts was deliberately indifferent to McKee's medical needs. Doc. 44-1 at 10-13. Although Spradlin's allegations are difficult to follow, the Court cannot conclude that Spradlin fails to state a claim.

Roberts does not contest that McKee's gender dysphoria is a serious medical need. Doc. 44-1 at 11-12. Rather, she contends that any allegedly deficient treatment for that medical need has no connection to McKee's injury—i.e., his death from the May 22, 2022 assault. *Id*. While the allegedly deficient medical care is unconnected to the inmate assault, Spradlin does allege that McKee suffered *other* injuries as a result of the deficient medical care—i.e., self-harm and mental decompensation. *See* Doc. 45 ¶¶ 67, 69, 79, 81, 86; *Belcher v. City of Foley, Ala.*, 30 F.3d 1390, 1396 (11th Cir. 1994) ("Under the Eighth Amendment, prisoners have a right to receive medical treatment for illness and injuries, which encompasses a right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries.") (internal citations omitted). Spradlin plausibly alleges that these injuries were caused by Roberts' actions or

inactions as a mental health unit manager responsible for McKee's mental health care. *See, e.g., Id*. ¶¶ 64, 67, 69, 79, 81. Thus, these allegations are sufficient to allege a nexus between the alleged inadequate mental health treatment and an injury to McKee.

Next, Roberts argues that because the amended complaint "outlines the times [] Roberts provided mental health treatment to McKee, documented that care, and made the documentation available to the necessary people," Roberts responded reasonably and Spradlin has failed to allege deliberate indifference. Doc. 44-1 at 12-13. While the facts born out in discovery may establish that Roberts did respond reasonably to the risk of McKee's self-harm and decompensation, the allegations in the amended complaint are sufficient to plausibly allege that Roberts acted with deliberate indifference. Spradlin alleges that Roberts was aware of McKee's risk of injury based on her prior reports of McKee engaging in self-harm, struggling with suicidal ideation, and not taking his prescribed medication. *See* Doc. 45 ¶¶ 69, 76, 79. And Spradlin plausibly alleges that Roberts' response to that risk—not providing him with medication or therapy—was unreasonable. *See id*. ¶¶ 181-93. Thus, in essence, Spradlin contends that Roberts' response to McKee's mental health challenges amounted to no treatment at all. At the motion to dismiss stage, these allegations are sufficient to allege deliberate indifference.

### *4. Count Seven: Supervisory liability*

Spradlin's amended complaint also alleges a "supervisory liability" claim based on the "defendants'" failure to "conduct thorough investigations into acts of violence" and "foster[ing] an unreasonable environment of violence which [] motivated and encouraged inmates to commit violence against each other and which resulted in

McKee's murder."  Doc. 45 ¶¶ 216-21.  Because Spradlin's amended complaint lumps all defendants together without delineating which allegations, if any, apply to which defendants, it is unclear whether Count Seven is applicable to Roberts.  Spradlin's response to the motion to dismiss argues that the amended complaint sufficiently alleges claims against "Roberts for supervisory violations" without specifying what conduct she engaged in as a supervisor.  Doc. 49 at 8.  To the extent Count Seven relies on Roberts' individual conduct, it is duplicative of Counts One through Four.  Otherwise, Roberts' amended complaint does not specify any supervisory acts that would be more appropriately analyzed under the supervisory liability framework.  Accordingly, Count Seven against Roberts is **DISMISSED**.

**B. Claims Against Defendant MHM**

> *1. Counts One, Two, Three, and Four: Failure to protect, failure to intervene, and deliberate indifference to medical needs*

Counts One, Two, Three, and Four do not include MHM because they do not allege liability under *Monell*, the appropriate vehicle for holding private entities, such as MHM, responsible for constitutional violations.  *See Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997) (holding that private entities that perform functions traditionally within the exclusive prerogative of the state can be liable under *Monell*).  Nevertheless, Spradlin's response to MHM's motion to dismiss contends that the amended complaint "sufficiently alleges claims against MHM for custom and policy deprivations" sufficient to state a claim under Counts One, Two, Three, and Four.  *See* Doc. 49 at 5.  But Counts One, Two, Three, and Four are devoid of any allegations about a custom or policy by

MHM that constitute deliberate indifference to McKee's constitutional rights.[7]  Doc. 45 ¶¶ 162-93; *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) ("[T]o impose § 1983 liability … [under *Monell*], a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation.").  Clearly, Spradlin's counsel is aware of the need to plead a custom or policy by MHM that caused McKee's constitutional violations because Spradlin's counsel denominates Counts Six and Seven as *Monell* claims and identifies specific customs and policies allegedly giving rise to liability.  Doc. 45 ¶¶ 209-21.  Spradlin's counsel cannot amend his complaint through arguments in his brief and the failure to identify a custom or policy by MHM that constitutes deliberate indifference to McKee's constitutional rights is fatal to Spradlin's claims against MHM in Counts One through Four.  *See, e.g.*, *Miccosukee Tribe of Indians of Fla. v. U.S.*, 716 F.3d 535, 559 (11th Cir. 2013); *Henderson v. McMurray*, 611 F. Supp. 3d 1287, 1295 (N.D. Ala. 2020), *aff'd*, 987 F.3d 997 (11th Cir. 2021).  Accordingly, Counts One through Four against MHM are **DISMISSED**.

---

[7] To the extent Spradlin argues that paragraph 46 identifies a custom or policy that constitutes deliberate indifference to McKee's constitutional rights, her claims still fail.  *See* Doc. 45 ¶ 46 (alleging that "a combination of overcrowding and understaffing taxed MHM's ability to provide adequate mental health care to severely mentally ill individuals, including McKee, manifesting in particular through inadequate monitoring of prisoners experiencing mental health crises").  First, this policy or custom has no connection to the May 22, 2022, assault—which Spradlin alleges was caused by the failure to confiscate weapons and monitor inmates—and, thus, it cannot be the driving force behind Spradlin's failure to protect and failure to intervene claims.  *Id.* ¶ 166.  Second, there are no factual allegations from which the Court could infer that MHM was responsible for prison staffing at HSP and, thus, no basis for the Court to conclude that MHM implemented this so-called custom or policy.  *Id.* ¶ 32 (alleging that MHM is responsible for mental health services).

*2. Counts Six and Seven: Monell liability*

Count Six alleges *Monell* liability against the "defendants" for "inaccurately classifying violent acts and causes of death that occur in" HSP and Count Seven alleges "supervisory liability" based on the "defendants" failure to "conduct thorough investigations into acts of violence" and "foster[ing] an unreasonable environment of violence which [] motivated and encouraged inmates to commit violence against each other and which resulted in McKee's murder." Doc. 45 ¶¶ 209-21. But there are no factual allegations that MHM had any role in the investigation, classification, or prevention of inmate-on-inmate attacks. Again, Spradlin alleges that MHM was responsible for mental health care, nothing more. *Id.* ¶ 32 ("Defendant [MHM] provides all the mental and behavioral health services for GDC pursuant to a contract.").

Spradlin argues that the Court should infer that MHM is responsible for the understaffing that led to deficient mental health care because the Middle District of Alabama concluded that MHM was "responsible for mental health deficiencies" in *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1267 (M.D. Ala. June 27, 2017). Doc. 49 at 7. First, Spradlin cites no legal basis for her assertion that she can "adopt[] and incorporate[]" facts from a district court case into her amended complaint. And a district court case discussing allegations of misconduct that occurred in a different prison, in a different state is irrelevant to the allegations involving HSP. *See Ivory v. Warden, Governor of Alabama*, 600 F. App'x 670, 678 (11th Cir. 2015) (holding that while "the defendants may have known of similar conditions in Alabama prisons generally as a result of other litigation or newspaper articles" that was insufficient to demonstrate knowledge by the defendants of the "specific conditions" at the prison challenged by the

plaintiff).  Second, even if MHM had a policy or custom of providing inadequate mental health care to prisoners, Spradlin does not explain how that policy or custom is related to, let alone the driving force behind, the constitutional violation alleged in Counts Six and Seven—i.e., the May 22, 2022 assault.  *See, e.g.*, *Purvis v. City of Atlanta*, 142 F. Supp. 3d 1337, 1343 (N.D. Ga. 2015) ("Plaintiff must show that the [defendant], acting through an agent with final authority, was responsible for an official policy or custom … and that the policy or custom was the driving force behind the violation of Plaintiff's constitutional rights.").  Accordingly, Counts Six and Seven against MHM are **DISMISSED**.

### 3. Count Ten: ADA

Spradlin also alleges that MHM violated Title III of the ADA.  Doc. 45 ¶¶ 235-239.  "Title III prohibits discrimination against the disabled by private entities at 'any place of public accommodation.'"  *Price v. City of Ocala, Fla.*, 375 F. Supp. 3d 1264, 1269 (M.D. Fla. 2019) (quoting 42 U.S.C. § 12182).  To state a claim under Title III, a plaintiff must allege that (1) he "is a disabled individual;" (2) "the defendant owns, leases, or operates a place of public accommodation;" and (3) "the defendant discriminated against the plaintiff within the meaning of the ADA."  *Gomez v. Gen. Nutrition Corp.*, 323 F. Supp. 3d 1368, 1374 (S.D. Fla. 2018).  MHM moves to dismiss arguing that it does not own, lease, or operate a place of public accommodation.  Doc. 44-1 at 18-19.

The Court is not aware, and Spradlin does not cite,[8] any authority "in which a jail or correctional institution has been held subject to the provisions of Title III."  *Kendrick v.*

---

[8] In response to MHM's argument, Spradlin contends that MHM is liable because it is an "'instrumentality of a State' for purposes of the ADA."  Doc. 49 at 12.  Whether MHM is an instrumentality of a State is irrelevant to establish liability under Title III of the ADA, which applies only to places of public accommodation.  *See* 42 U.S.C. § 12182(a).

*Faircloth*, 2010 U.S. Dist. LEXIS 3908, at *41 (M.D. Fla. Jan. 19, 2010).  Rather, existing "legal authority … suggest[s] that a jail or prison facility does not constitute a place of 'public accommodation' as defined in the applicable statutory provisions."  *Id*. (citing *Morgan v. Mississippi*, 2008 WL 44981 *5-6 (S.D. Miss. 2008); *Brown v. King Cty. Dep't of Adult Corr.*, 1998 U.S. Dist. LEXIS 20152, at *16 (W.D. Wash. Dec. 9, 1998)).  Notably, a penal facility is absent from the statutory definition of public accommodation.  42 U.S.C. § 12181(7).  In any event, even if HSP is a place of public accommodation, there are no factual allegations that MHM owns, leases, or operates HSP.  Thus, Spradlin fails to allege that MHM owns, leases, or operates a place of public accommodation.  Accordingly, Count Ten against MHM is **DISMISSED**.

## C. Claims Against the GDC and the Board of Regents

### 1. Counts One through Seven: Section 1983 claims

The GDC and Board of Regents move to dismiss Counts One through Seven as "barred by the Eleventh Amendment and the doctrine of sovereign immunity, and by the text of section 1983."  Doc. 48-1.  Spradlin does not respond to this argument.  *See* Docs. 50; 52 at 2.  This alone would be sufficient grounds for dismissing Spradlin's claims.  *Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014) (quoting *Hudson v. Norfolk S. Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001)) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.").  But the GDC and Board of Regents are also correct that Counts One through Seven are improper because the GDC and Board of Regents are not "persons" susceptible to liability under § 1983.  *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 65, 70-71 (1989) (holding that states—and, by extension,

arms of the state—are not "persons" within the meaning of § 1983). Thus, Counts One through Seven against the GDC and the Board of Regents are **DISMISSED**.

*2. Counts Eight and Nine: ADA and Rehab Act claims*

"To state a claim under either Title II or § 504, a plaintiff must establish '(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability.'" *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1134 (11th Cir. 2019) (quoting *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir. 2007)). "[P]roof of a Title II or § 504 violation entitles a plaintiff only to injunctive relief." *Id*. "To get damages," as Spradlin seeks here, she must plausibly allege "that the entity that [she] has sued engaged in intentional discrimination, which requires a showing of 'deliberate indifference.'" *Id*. (quoting *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 348 (11th Cir. 2012)).

From what the Court can decipher, Count Eight alleges that the GDC and Board of Regents intentionally discriminated against McKee by (1) failing "to provide safe housing" and (2) failing to provide "appropriate medical care." Doc. 45 ¶ 227. Even assuming that McKee is a qualified individual with a disability,[9] Spradlin's discrimination claims fail because she does not plausibly allege deliberate indifference or causation.

---

[9] Count Eight alleges in Spradlin's usual conclusory fashion that "McKee was a qualified individual regarded as having a mental impairment that substantially limited one or more major life activities" but does not allege what disability McKee has. Doc. 45 ¶ 226.

Turning to Spradlin's inappropriate medical care discrimination claim, she alleges that the failure to provide appropriate medical care is the result of "overcrowding and understaffing" in Georgia prisons.  *Id*. ¶ 46.  However, Spradlin does not include any allegation to support the third element of a Title II discrimination claim—that the alleged deficiencies in McKee's medical care were "by reason of his disability."  *Silberman*, 927 F.3d at 1134 (quoting *Bircoll*, 480 F.3d at 1083).  In fact, Spradlin's assertion that understaffing was a general problem at HSP undermines her contention that McKee's disabilities were the cause of the allegedly deficient medical care.[10]  Doc. 45 ¶ 124; *see Chambers v. Benton*, 2022 WL 22694702, at *2 (S.D. Ga. May 6, 2022) ("[The plaintiff's] allegation that understaffing is a general problem at [the prison] belies any assertion that discriminatory animus was the reason for the understaffing of the ADA dorm.") (citing *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1077 (11th Cir. 1996)) ("In everyday usage, 'because of' conveys the idea of a factor that made a difference in the outcome.  The ADA imposes a 'but-for' liability standard.").  Consequently, Spradlin's allegations of discrimination stemming from improper medical care do not plausibly allege causation.

As for Spradlin's assertion that the defendants discriminated against McKee by failing to provide safe housing, Spradlin does not allege how any official with authority to bind the GDC and Board of Regents was subjectively aware that reassignment to Dorm E-1 posed a threat to McKee's safety.  *Silberman*, 927 F.3d at 1134 ("[I]n order to hold a government entity liable, the plaintiff must demonstrate that an 'official who at a

---

[10] The Court is not suggesting that Spradlin cannot allege alternative theories of liability.  Rather, the point is that while Spradlin alleges McKee was injured and killed because of understaffing, she never gets around to alleging that McKee's medical care was deficient "because of" a disability.

minimum has authority to address the alleged discrimination and to institute corrective measures on the [entity's] behalf' had 'actual knowledge of discrimination in the [entity's] programs and fail[ed] adequately to respond.'") (quoting *Liese*, 701 F.3d at 349) (alterations in original).  Spradlin argues that "Wardens Toby, Foston, Washington, and Ivey were aware of McKee's 'stressful dorm environment'" from "Robert's 'Suicide Risk Assessment Instrument'" created on May 2, 2022.  Doc. 50 at 7 (citing Doc. 45 ¶ 97).  But as discussed, Spradlin offers no explanation to tie this vague reference to a "stressful dorm environment" to the specific risk that McKee faced from Dorm E-1.  Thus, this allegation does not support Spradlin's contention that the Warden and Deputy Wardens had notice of the dangerous conditions in E-1.  Next, Spradlin cites a handful of conclusory allegations that the Warden and Deputy Wardens were "aware of the dangers of placing McKee" into Dorm E-1.  Doc. 50 at 4 (citing Doc. 45 ¶¶ 107, 120).  But a bare allegation of knowledge coupled with a legal conclusion is plainly insufficient to state a claim.  *Chaparro*, 693 F.3d at 1337 (quoting *Iqbal*, 556 U.S. at 678) ("Factual allegations that are 'merely consistent with a defendant's liability' fall short of being facially plausible.").  Thus, Spradlin's allegations of discrimination based on unsafe housing do not plausibly allege deliberate indifference.

Finally, the Court easily disposes of Count Nine because it merely recites the legal elements of a Section 504 claim and is devoid of any factual allegations describing *how* the defendant's conduct violated the Rehab Act.  Doc. 45 ¶¶ 229-34.  In the absence of any allegations providing the defendant with notice of how its conduct violated the Rehab Act, Count Nine fails to state a claim.  *Twombly*, 550 U.S. at 555 (holding that the complaint must "give the defendant fair notice of what the … claim is

and the grounds upon which it rests.").  Accordingly, Count Eight against the GDC and Board of Regents and Count Nine against the GDC are **DISMISSED**.

## IV. CONCLUSION

For the reasons stated, MHM's and Roberts' motion to dismiss (Doc. 44) is **GRANTED in part** and **DENIED in part**.  As to MHM, Counts One, Two, Three, Four, Six, Seven, and Ten are **DISMISSED**.  As to Roberts, Counts One, Two, Three, and Seven are **DISMISSED**.  Additionally, the GDC's and the Board's motion to dismiss (Doc. 48) is **GRANTED**.  Counts One through Nine against the GDC and Board of Regents are **DISMISSED**.  All dismissals are without prejudice.

**SO ORDERED**, this 19th day of August, 2024.

<u>S/ Marc T. Treadwell</u>
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT